oral arguments, 15 minutes per side. Mr. Jones and Ms. Newbern for the appellate. Good morning, your honors. I'm Alastair Newbern from the Vanderbilt Appellate Litigation Clinic. I am appointing counsel for Appellant Willie Earl Goldsmith, but with the court's permission, argument today will be made by 3L, third-year law student, excuse me, your honors, Charlie Jones, who has been certified by this court's student practice rule. Thank you. Good morning. May it please the court, I've reserved 3 minutes of rebuttal time. Willie Earl Goldsmith is a prisoner. He's also a writer. But since 2007, Goldsmith has faced a complete, comprehensive, and unlawful ban on his writing. The district court dismissed his untimely Goldsmith Section 1983 action challenging this ban. It erred for 3 reasons. First, Goldsmith has adequately alleged a continuing constitutional violation in the form of a, quote, total ban on his writing that has followed him from one prison to another and continues to this day. It's therefore timely until it's remedied. Second, under this court's holdings in Brown and Waters, the statute of limitations on Goldsmith's claim regarding the initial retaliatory seizure of the Green Tag Manuscript was told while he pursued his available state remedies, including state court review of the administrative decision. Third, at the very least, Goldsmith should have been allowed to amend his complaint to include additional facts that he alleged in later filings that show the truly continuing nature of this ban. To Goldsmith's first and really his primary claim here, as the prior panel recognized, under Kunle Brothers, this ban constitutes an ongoing barrier that actively deprives Mr. Goldsmith of his constitutional rights every day that it remains in effect. Isn't he a prisoner? Yes, Your Honor. Doesn't he have a lot of constitutional rights that are banned because he's a prisoner? Your Honor, Goldsmith still has his First Amendment rights in prison. Oh, but you acknowledge that there are some rights that he does not have, like freedom. Yes, Your Honor, that's correct. But for the prison to restrict his First Amendment rights, it has to show that its regulation is reasonably related to a legitimate penological interest. So drawing pornographic pictures of a female prison guard is a legitimate First Amendment privilege in a prison? Your Honor, well, first of all, he was writing. There was no drawing. Okay, but there were some pictures of a nude woman, or not semi-nude woman, and it was the prison guard's name, the female prison guard's name was mentioned in there. Yes, Your Honor, he cut an image out of a prison magazine and pasted it on the front of his manuscript. But the First Amendment protects even sexually explicit content. Goldsmith can write... In a prison? You got cases that say that? Your Honor, as far as a prison is concerned, the prison has to show under Turner that its regulation is reasonably related to a legitimate penological interest. What Goldsmith alleges here is that every adverse action taken by the defendants here was in fact an act of retaliation. And the facts that he provides support that claim. He went over a year at Alger Prison in possession of these 26 manuscripts in his footlocker, subject to regular cell searches by the prison's own admission, and it wasn't until September of 2007 when he filed the initial grievance against Defendant Charette here about the count lights that any of his writing became objectionable. Are all of the stories that he wrote pornographic or semi-pornographic in the sense of describing sexual relations with female guards primarily and prisoners? No, Your Honor, and that's an important point. What Goldsmith alleges here is that the ban on his writing is comprehensive. He specifically alleges that they've seized a children's book, both of his dictionaries, some of his mail... Does he know from this record what all of the writings were, whether they were all of a similar nature or about sex and pornography and so on? No, Your Honor. Well, what he said... But, Goldsmith, any stories that we know of that were not about sex and for some pornographic? Yes, Your Honor. We don't have the actual stories in the record. No. However, what he alleges is that a children's book was seized, which had nothing to do with, or according to the record, had nothing to do with sexually explicit content. His dictionaries, he had mail rejected that was going to his attorney because it, quote, looked too much like a story. Those allegations support his claim that he was, in fact, facing a retaliatory comprehensive ban on writing whatsoever, and he also received periodic verbal threats from both Defendant Charette... Is there anything in the record that would indicate that the prison officials told him verbally or in any way that the censorship related to the pornographic nature, sexual nature of what he was writing? The disciplinary findings, some of them cite the sexual nature of the content. Well, now, let me ask you this. What do you understand to be the argument of the prison officials that in this context, that is the prison context, free speech has to give way to some degree of discipline about this and has to give way to conduct that would not make a disciplinary problem in the prison? What do you understand their argument, the prison argument to be, the reason they're giving for that? Your Honor, I suppose it would be a security interest. However, I should note that they haven't raised any security interest here. This was dismissed solely on timeliness grounds. But the purported security interest would be in restricting Goldsmith's writing for purposes of prison discipline and security. However, what Goldsmith alleges here is that that was simply not the case. As I mentioned, he had these writings in his possession without incident for a very long time, and it wasn't until the grievance that they became an issue. He also alleges that everything that he was… Wait just a minute. They found out about it, then they proscribed it. Is that right? No, Your Honor. They knew about it for a long time and tolerated it, but then at some point they proscribed it. Is that what you're saying? The record indicates that he was at Alger Prison in possession of what appears to be thousands of pages of writing in his footlocker. And it wasn't until a year after, over a year after he was an inmate at that prison that it became an issue. And that was immediately following his grievance filed against Defendant Charette, which was upheld about the count lights. And at that point, that instigated a chain of events which culminated in a comprehensive ban on writing about a month later. And that's what Goldsmith alleges here. With respect to the security interest, he also… Was the ban on writing itself in writing? Yes, Your Honor. What exactly did it say? It said, quote, prisoner being allowed to continue with this writing will interfere with his rehabilitation. What does this writing mean? Your Honor… He couldn't write a letter to his mother? He couldn't write a letter to his attorney or to his nephew. Oh, but that's the reason because they had sent something that he was wanting the attorney and the nephew to put out on the Internet, wasn't it? One of his stories. Your Honor, yes, but again… Yes, but? Yes, but the security interest with respect to outgoing mail is materially different. Well, let's just think about something, though. The last confiscation, I think, happened when? The last confiscation happened, I believe, in February of 2008. April. April, you're right. April of 2008. And so when did he bring his lawsuit? He brought his lawsuit in February of 2012. I see. That seems to be about four years. I'm from Kentucky, so I can still cipher. Understood, and that is correct math. However, what Goldsmith alleges here is that the ban was continuing, and he has alleged in his response to the motion to dismiss sufficient facts to support that allegation. But he didn't raise that below. Your Honor, he included that in the response to the motion to dismiss, and that was before the district court very early on. The district court should have included that in its consideration of the complaint. Why didn't it consider the continuing nature? Your Honor, it simply found that he hadn't alleged sufficient facts to support a continuing violation. But the facts included in the response to the motion to dismiss indicate that this was an ongoing ban. He alleges specifically- No, I'm thinking about the tolling issue. Yes, Your Honor. The district court dismissed both of those. It said that he hadn't alleged a continuing violation and that the tolling issue under Brown was that he had lost on that issue as well. With respect to the continuing violation, however, he alleges that once he arrived at Marquette Branch Prison, Deputy Ayalto at that prison came to him and informed him that the writing restriction in his file would be enforced by her guards as well. When did he arrive at this new facility? In September of 2008. But he alleges that he received periodic verbal threats from both Defendant Charette and from other guards while he was at the prison, and he alleges specifically that it is for fear of further retaliation that he has ceased writing entirely. And in his complaint, he alleges that this is an ongoing and permanent ban and that it continues to this day. Okay, but the permanent ban is on pornographic writing, right? Your Honor, the way that that ban has been enforced indicates that it is comprehensive, that it's on every- Okay, but let me understand the facts. When was the children's book and dictionary confiscated? On October 22, 2007. And did he request those back? Your Honor, that's not in the record. He did, before the ban was put in place, he was, some of his manuscripts were returned to him, and he did request, for instance, the Green Tag manuscript, which was the initial manuscript that was seized. He requested to have that back, and that apparently was destroyed. And the record indicates, at least according to Mr. Goldsmith, that everything that was seized was destroyed. Okay, I thought he got some things back. He did at the very beginning, but once this ban was put in place on October 15, 2007, the ban that I referenced earlier, once that was in place, nothing was returned. All right. That was in October 2007. And as Judge Merritt brought out, it used the word, this writing. Yes. Okay. Now, did he allege that non-pornographic writings were confiscated? When was the children's story taken? That was on October 22. Oh, okay, that was October 22. After the ban? I'm sorry. Yes, Your Honor, that would have been a week after the ban. However, the ban was repeated in the hearing with respect to those seizures as well. The ban was reiterated in that hearing. Counsel, on the merits of this case, do you want us to tell the prison system to distinguish between the kinds of writings, or do you want, what is it that you're seeking? If you are running a prison or a whole system and you've got to obviously have some rules, just like we have some rules about free speech in the courtroom, I mean, the context about speech makes a big difference. Of course. What is your suggestion as to how prison systems should be run with regard to speech so that would you be okay if the prison, would you as a prison official censor pornographic writings, if that is what it is, concerning female prison guards, the things that were offensive to the prison guards? Would you be okay if that distinction is made there that you may not do that? Your Honor, I see I'm out of time. May I answer your question? Yes. With respect to the way the prison system runs, I certainly understand the security interests that are implicated in this type of situation. And with respect to that interest, I think the Turner Standard is a fair standard. The prison can regulate when its regulation is reasonably related to a legitimate penological interest. However, I think the court's role is to recognize that when the prison is acting based on retaliation and not according to a legitimate... I'm not asking you about that. I'm asking you what would you forbid, if anything? Your Honor, I would certainly forbid things that, or writing that could be shown to be a legitimate threat to security. I don't know exactly where I would... We have to get specific finally in court here. Would that include pornographic writings of female prison guards and prisoners? Would that include that or exclude that, the censorship? Your Honor, in my view, the censorship would not include that unless it could be shown to cause a legitimate security problem. The fact of the matter is that Goldsmith has been in prison for... You would let him write the pornography? Unless there was some indication that it was actually threatening... Unless, I mean, the indication is that this kind of pornography is highly offensive to the guards, and it tends to interrupt the discipline in the prison. But you would allow that? Well, Your Honor, I wouldn't say it's fair to say in this case that that is exactly what was going on. Again, this writing was known to the prison and it was unobjectionable for a long time until Goldsmith actually filed a grievance that was entirely unrelated to this. And at that point it became a security threat. Do we know that they read this material beforehand? Your Honor, the prison in one of its misconduct hearings states that Goldsmith was already subject to regular cell searches. Presumably all the prisoners were, and presumably he was subject to a search when he came into the prison with these 26 manuscripts. This was all in his possession and it was all maintained in his footlocker. And it wasn't until that grievance was filed that it suddenly became a threat to the security of the prison. And were they all found in the footlocker? Is that where everything was found? Yes, Your Honor, that's what the record indicates. The manuscripts, at least. Well, suppose they looked at it when he filed the grievance and said, huh, you mean he's got other stuff in here? And they go, well, look here, he's got a footlocker full of it. Does it make any difference when they found it? Your Honor, it wouldn't if that... If they didn't know it. If we assume that they didn't know about it, that point would be undermined by the fact that they returned three of the four originally seized manuscripts. When? After he filed the grievance? After he filed the initial grievance, which was unrelated to the writing. What were those manuscripts about? They're not in the record, Your Honor. The one that is, the Greentag manuscript, according to the... I recognize you're representing someone who appeared prosaic. Yes, Your Honor. So the record is somewhat sparse. However, even if all of those writings had the same kind of content that was in the Greentag manuscript, three of the original four that were seized were returned to him. So those were deemed not to threaten security interest, but then Goldsmith was subject to repeated retaliatory acts, which culminated in this ongoing ban. He kind of got carried, started getting more and more... Demonstrative? Your Honor, I guess at one point he did get demonstrative with the guards, but that doesn't undermine his... No, I mean something about making certain guards be named. I don't recall that he ever used a specific name. Oh, yeah. What about the one female bent over a car and it was a guard's name? Was this what she does on her day off? Yes, Your Honor. He said Layla was her name, but I don't think that that was referencing any particular prison guard. He wrote fiction. His stories were fiction. However, he wrote about what he knew. He was in prison for several decades and he knew prison and he knew prison guards. And that's what he wrote about. And that was unobjectionable until he filed a grievance against defendant Charette. And at that point, this writing was a security interest or was a threat to security. The District Court really didn't analyze any of this, though, did it? No, Your Honor. Judge Edgar just dismissed it on statute of limitations basis. Yes, Your Honor. That's what's before us. Yes, Your Honor. Counsel, then I'd like to go back to the dates, okay? Yes. So you told us that the innocuous material was taken in October of 2007. Yes, Your Honor. And that's also when the ban on this writing. Is that correct, October of 2007? Yes, Your Honor. Okay, so what seizures came after that? After that, there was the letter to the attorney in November of 2007 that was rejected because it, quote, looked like a story. But it did have a story in it, right? Your Honor, if I recall correctly, it was referencing the seizures of his materials. It was going to his attorney. Okay. And then there were a few to his nephew? Yes, Your Honor. There was mail to his nephew. There was another manila folder with unfinished stories. The record is not clear what those stories were about, but they were seized as well. And then mail to his nephew was against it. Okay. The last seizure, you said, was in September of 2008? Actually, I think it would be the summer of 2008, so June, I believe. Yes, Your Honor, because he was transferred in 2008 in September. Okay. So then in September of 2008, he's going to a new facility, right? Yes, Your Honor. But Charette was transferred also? Charette came with him. Okay. And then you're saying there have been no seizures since then? It doesn't indicate that there have been any seizures since then. But, Your Honor, he alleges facts that would support why there haven't been any seizures. He alleges that he stopped writing. He stopped writing, and he has received periodic threats not to write, and frequent cell searches intended to deter him from writing. Okay. But do we have any reason to believe that if he wrote non-pornographic materials or materials set someplace else that they would be confiscated? Yes, Your Honor. In August of 2011, he filed another grievance with Warden Napel, I believe, that referenced specifically the, quote, ongoing retaliation in the form of the ban that he was still facing. That was six months before he filed this action. But what I'm trying to get at is the ban. The ban, as far as we know, is the ban that was talking about this writing. I mean, how do we – let's say we reject your argument that he has a First Amendment right to write pornographic material about the guards, okay? Then we would be left with communications to his attorney and non-pornographic writing. And the fact that it was outgoing mail. All the manuscripts were marked as outgoing mail, and the letters were obviously intended as outgoing mail. Okay, but the mail had a request that it be posted on the Internet, right? The letters to his nephew were meant to go on the Internet. Okay. So let's say we reject your argument that there's no penological interest in not having pornographic stories about the prison guards,  and what we're left with is attorney mail and innocuous writings. Is there an allegation or is there any reason to believe that a broader ban is ongoing into the statute of limitations period? Your Honor, what Goldsmith alleges is that once he arrived at Marquette Branch Prison, he was informed that the writing restriction in his file would be enforced, and he received the periodic threats and he ceased writing. What you'd be left with as well is the retaliatory motive that he alleges here, which is not something that can support a legitimate interest. Goldsmith has alleged that every adverse action here was retaliatory against him, and there are facts that support that allegation. Additionally, and I haven't mentioned this, the prison library was full of materials that were very similar to what Goldsmith wrote. Penthouse Magazine. Penthouse Magazine had a picture of Layla bending over a car. I don't know which magazine. On a weekend off. Your Honor, the picture came from the magazine. He wrote the caption. I don't know which magazine he got it from, but there were also books. He wrote the caption, which was one of the reasons why they found it to be bad. Yes, Your Honor, but that doesn't explain all of the other sections. Okay. And one other question. He did not... Okay, they brought a statute of limitations defense. Did he respond with the argument that it was told when he was going through the administrative proceedings? In the... Yeah, he responded with the argument that he was facing a continuing violation. No. I'm asking a different question. Are you arguing that if you count the time that he was pursuing... that he was exhausting his administrative remedies, he would be within the statute even without a continuing violation? Or the initial retaliatory seizure. Yes, Your Honor. The prior panel recognized two distinct constitutional violations here. The initial retaliatory seizure, which was the one that happened in September of 2007, that one is the one that the tolling issue is relevant to. And he pursued that claim all the way to the Michigan Supreme Court. And with respect to that seizure, yes, Your Honor, the statute of limitations should have been told while he pursued all the way to the Michigan Supreme Court. And how did the district court address that? The district court addressed it by finding that under Brown, the state court review didn't toll the statute of limitations. However, we are arguing that that is an incomplete analysis because that finding didn't consider this court's holding in Waters v. Evans, which did exactly what we're advocating for today, which is tolling for the state court review of the administrative decision. If you get state court tolling for that period of time, then you're within the time. Then it's a continuing violation, and you're okay or not. Your Honor, the tolling issue would bring in the discrete violation, the initial retaliatory seizure. With respect to the ban that he's facing, he's seeking an injunction, and he alleges that it's a continuing violation. That's the prior panel. It wouldn't help you on the statute there. The period of time in the state court would not get you over that hurdle or am I misunderstanding the situation? It wouldn't get us over a hurdle with respect to the continuing violation because the argument there is that it's timely now. It's timely until it's remedied, and he alleges that it's ongoing. Unless you can win on the ground that this is a continuing flat ban against his writing, whatever his writing may be, you have to win on that point in order to have a continuing violation, right? Yes, Your Honor. However, I should mention that there were 12 additional grievances that he cited. I understand. Yes. But you have to win on that concept. He would need to show a continuing violation to get the injunction. Permanent ban. Yes, an ongoing violation. Yes, sir. So when you say there were other administrative proceedings, would any of them bring this within the statute of limitations? Which claim? The initial claim would be brought. Not the initial claim. Okay. Would administrative tolling affect anything else other than that? It potentially could affect the continuing violation because we don't know from the record when those 12 additional grievances were exhausted. Isn't that his burden to tell the court? No, Your Honor. The exhaustion is not his burden. That's an affirmative defense. Failure to exhaust is an affirmative defense, and it's the defendant's burden under Jones v. Bowen. Okay. I'm not talking about failure to exhaust. I'm talking about they show you're beyond the statute of limitations. So maybe I misunderstand what you're saying. I thought you were saying that tolling while he pursued administrative remedies would bring or might bring some of these other claims into the statute. Did I misunderstand that? Your Honor, with respect to the initial claim? Not the initial claim. Sorry. Forget continuing because then you don't need tolling, right? Right. Okay. Are there any other aspects of the claim that might be within the statute of limitations if you apply tolling while he was pursuing administrative remedies? Yes, Your Honor, potentially. But it's not clear when these were finally exhausted, so we don't know the period of tolling. And what I was saying is that once they show that he's beyond the statute, isn't it his obligation to say, no, I'm not, this case was pending until this date? Your Honor, the burden would shift if they did show that, but they haven't shown that he was outside of the statute of limitations. He filed a grievance in 2011 addressing the ongoing retaliation, and that was six months before the complaint was filed. But nobody took anything away from him at that time, though, did they? No, Your Honor. Nobody had taken anything away from him for about four years, right? Yes, Your Honor. But, again, that was because he was facing periodic threats not to write. Okay. Let me just ask you about a few of the individual defendants. Who is there besides Sharon? There is Defendant Carberry, Maki, Exelby, and Belfry, I believe. Okay. Are they all in the same position? Doesn't Maki have immunity? I'm not sure who the last one is. I don't know with respect to immunity. Maki was a hearing officer. I think most of the other defendants were guards or corrections officers. But he's named all of the defendants that would have the power to lift the ban here. Okay. And then are you asking for monetary damages or just injunctive relief? Your Honor, his primary relief is the injunction. He wants the ban lifted. He has requested damages. And if there are damages with respect to the enforcement of the continuing violation, that would be for the district court to decide based on.  So why are we even talking about the statute of limitations if his primary aim is to get some injunctive relief? Because, Your Honor, the prior panel recognized two distinct claims. And so the initial retaliation would be barred by the statute of limitations unless state court review was counted for purposes of tolling. The continuing violation, Your Honor, we're arguing is not barred by the statute of limitations because it is a continuing violation. Well, did you – maybe I didn't make my question clear. I mean, if you're arguing that this is a continuing violation and that's the basis for getting an injunction, then did you explain that to the district court that it doesn't really matter about these past instances because what we're focusing on is what's happening now and we're not asking for monetary relief. We're asking for injunctive relief. Yes, Your Honor. I don't believe Goldsmith's complaint was particularly clear in making that distinction. But it is fair to say that the injunction is sought to lift the ban and address the continuing violation. He did ask for leave to amend his complaint. And he specifically asked for leave to make it clearer that he was seeking injunctive relief to address this continuing violation. And he should have been allowed to amend his complaint to include both the additional facts in the response to the motion to dismiss as well as to make it clearer because he was, again, a pro se plaintiff. Okay. Thank you. Thank you. Good morning. May it please the court, counsel. Cliff Schneider from the Michigan Attorney General's Office on behalf of defendants' appellees Sherritt, Mackey, Carberry, Exelby, and Belfry. I think as this court has already recognized, there was a period of about four years in this case before Goldsmith filed his complaint where nothing bad happened to him. In his proposed amendment, he'd like to talk about a couple of threats that were made during that period but nothing actionable. No writings were seized for Mr. Goldsmith since Right, but he's alleging that, what he's alleging is, okay, I got the message. I'm not writing, but I want to write. And please lift the ban so I can write. And, Your Honor, we're not acknowledging that there's any ban as part of the, I think, difference here. There was the administrative hearing report by Carberry from October 15, 2007, where she said a prisoner being allowed to continue this writing will interfere with his rehabilitation. After that I'm sorry. You dropped your voice. Oh, I'm sorry. Yes, Your Honor. In her October administrative hearing report, Carberry, as the hearings officer, said that prisoner being allowed to continue with this writing will interfere with his rehabilitation. Now, after she said that, going into the future, every time a writing was confiscated from Goldsmith, he had another hearing with a different decision related to the specific writing at issue. There was no categorical restriction on his writing. There's no barrier to be lifted here. This isn't a case as if once Carberry's October 2007 decision was made, all of Goldsmith's writings were confiscated without hearing from that time forward. If we had that situation, this would be a little more like Coonley Brothers. What we have here, though, as time goes on, we have discrete acts. We have confiscations of different writings, presumably possible different results on the merits, if those were challenged timely in court. Your Honor, I thought that everything that he had was confiscated, including at least allegedly children's stories, et cetera, so that what was being confiscated was not limited to the pornographic stories but included other things. Is that wrong? That's correct, Your Honor. On October 22, 2007, I believe it was a Pelley Sherritt confiscated about four inches of materials from Mr. Goldsmith without going through it to see what was in there. She turns it over to the hearings officer who decides is this material allowed or not allowed. So is that what's going to happen? And then what happened there? We don't have a good record of what happened there, Your Honor. I believe Mr. Goldsmith's— That was the point. He wasn't returned, and there was— He would think that everything that he wrote, if nothing was returned, everything that he wrote and had been confiscated, whether it was about pornography or not, would be censored, if that is true. I mean, that's kind of a reasonable inference from that. Correct? Correct, Your Honor. And there was a good time to look at what was confiscated. It was back in 2007 when it happened, when we could still look at the four inches of paper and see what was actually in here. Was this or was this not a violation of the First Amendment to take this paper away from Mr. Goldsmith? It's by waiting four years until he filed the complaint here, beyond the statute of limitations— It goes back to whether his view or whether the law should view this as a permanent ban on his writing. If it's viewed as a permanent ban on his writing, then he's got a better argument that it's a continuing violation. He can no longer write. He's censored whatever it is he writes. If a distinction is being made, the censorship relates only to these certain specific things, there is no continuing ban on things that fall outside that category. You follow me? So the question on the First Amendment, excuse me, on the question of statute of limitations has to do with the reasonable inferences he would have drawn, it seems to me, from everything that was confiscated. That's why I'm asking the question. Yes, Your Honor. I agree, except that the record fully supports that there was no permanent ban because he continued to receive the hearings on each writing that was confiscated. Every time a writing was confiscated, he received a hearing. He moved to a new prison in September 2008, outside the limitations period. He alleges that two of the appellees followed him, but not the hearings officers. Had he had any materials confiscated at his new prison, he would have had a different decision maker, a different hearings officer, determining whether or not he was permitted to possess those papers. I think that goes along, too, to showing that. What you're saying is it should be clear to him, or to a reasonable person at least, that not everything he writes would be confiscated, only the pornography and things of that type would be confiscated. That's what you're saying would be the reasonable inference from the conduct of the prison officials. Your Honor, I think that is a reasonable inference because we have maybe ten or more confiscations at issue here. Only one of them, the four inches of paper, allegedly included some non-pornographic material. Every other confiscation was related to these pornographic materials. One was a letter to one of the defendants accusing her of engaging in pornographic acts. I think everything, except for that one incident back in October 2007, it is all the pornographic material. I think it would be clear to a reasonable person that's what was being targeted here. Did they all involve prison guards? I'm not sure on Goldsmith's position on that, Your Honor. It was my understanding that they all involved prison guards. I could be incorrect on that. We don't have these manuscripts here at this point to look at these. Okay, but what we have here is simply a statute of limitations ruling. Correct, Your Honor. And if he is pleading that he is under a continuing ban, then why is he not within the statute of limitations? At least as to that. Let's say he started an action tomorrow that says, I would like injunctive relief. I am under a continuing ban that restricts my ability to write. I agree, Your Honor. That could go forward. I think the defense would be there's no ban. You're at a different prison. We can't do anything to help you anyway. Okay, and let's say his response is, well, you say there's not a ban, but Officer Sharratt, who I live with every day, tells me every day that there's a ban. And there's a way to figure that out, Your Honor. I think the way is to have a piece of paper in the cell and see if it gets confiscated. If so, he gets a hearing. He gets his due process on every piece of paper that's confiscated. He has three years to even file a suit in the federal court. He could take that action to state court and challenge that confiscation. And he received all that due process with regard to every confiscation here. This is not a situation where there was some blanket ban where every time he wrote a piece of paper, it was taken and discarded without process. Is he under this ban now? He claims he is, Your Honor. I'm asking you, is he? No, Your Honor. So even this ban on this writing does not apply now? Michigan Department of Corrections policy directives still apply, Your Honor. If he writes writing that interferes with his rehabilitation or is a threat to the security of the facility, yes, absolutely, that would apply to his writing. Okay. So if we issue an opinion that says that he's not under a ban and that's the representation of the defendant, and he's only subject to the same regulations that apply to everybody, then that would be fine? Correct, Your Honor. So you're just saying that there's no need for an injunction because there's no ban. He's at a new institution. I mean, is that decision from 2007 still in effect? Your Honor, that decision from 2007, on its face, applied to those three writings that were in front of the hearings officer at that time. Three writings were confiscated. It went to a hearing. The hearings officer, Appellee Carberry, looked at those three writings and wrote, Prisoner being allowed to continue this writing will interfere with his rehabilitation. Okay, but why isn't this a question of fact? I mean, you're saying things, and it's true that if they're true, then he would not be entitled to any relief, but he's alleging other things. How do you get, I mean, shouldn't there be some testimony to get to the bottom of it? Your Honor, I think the record shows that it's not a continuing ban because we have discrete acts where each time something was confiscated, Mr. Goldsmith received a new hearing. I know, but that's, I mean, I'm not convinced that that would defeat a continuing policy. If you have a continuing policy, let's say you had a policy that you can have no writing. You can make the same argument. It's not a continuing policy in the sense that it tolls the statute or that you need any prospective relief because if you write something, we'll confiscate it and you'll get a hearing. But the law provides that you don't necessarily have to do that if there's an infringement on your First Amendment rights. Correct, Your Honor, and that's Kuhnley Brothers. We'd have a policy in place that would affect Goldsmith each and every day afterwards. What we're arguing here is there is no such policy. But that's a question of fact, isn't it, given what he says? I don't think so, Your Honor, because we have the individual hearings about the individual writings. I'm sorry, you're saying because he's entitled to individual hearings? The ban, the alleged ongoing ban in this case, Your Honor, is not some policy directive or statute. What it is is Carberry's October 2007 statement that prisoner being allowed to continue with this writing will interfere with his rebid. That's not the way I understand him. I understand him to be saying that the way that's been enforced is that they're applying it to everything. Did the children's book come before or after that? I think it came after, right? After that, Your Honor. Okay, so he has some plausible position that, look, the one time I had something that wasn't pornographic, they took that too. And every time they write something, they take it. What I'm getting at is that I almost feel like I'm being asked to decide facts. He has one version, you have another. And that doesn't have to do with the statute of limitations. That has to do with whether what he's saying is really true. Your Honor, even under Coonley Brothers, if there was an ongoing violation, Mr. Goldsmith's damages here would be limited to the period from filing the complaint minus 3 years for the statute of limitations. And nothing happened to Mr. Goldsmith in that period. But that's why I asked him, is this about money or is it about a prospective injunction? But the case at that point, Your Honor, is Mr. Goldsmith saying, I'm under this ban for the last 3 years, nothing's been taken, I'm just scared. That doesn't state a cause of action. That's really not an actionable claim for him to say, I've been threatened or I was scared. It's not in the First Amendment context? No, Your Honor. I think there's case law that would support that. I don't have a case in front of me. But for him just to say, I've been threatened, I don't think that rises to the level of a confiscation or a retaliatory action. Let me ask you, if I can understand exactly what you're saying, is the concept you are suggesting that the prisoner here is not contesting the general rule of the prison system concerning behavior that is contrary to his rehabilitation or prison discipline, but rather is contesting the application of that standard to his individual writings and that under that view of the case, view of the problem, he has to make a grievance if he is dissatisfied with the way the prison system is applying the standard. Is that what you're basically saying? Thank you, Your Honor. That's exactly it, yes. That's correct. Mr. Goldsmith has not challenged the constitutionality of that statute that prohibits some writings in prison. But the application of the statute in the individual and perhaps in one case earlier, which is certainly outside the, as long past, in one case about the books, the children's books, the prison system may have violated his constitutional right there by taking that. Yes, Your Honor. But he had an opportunity to contest that and he did not, is that right? Your Honor, he had the opportunity to contest it and he lost. Whether or not he proceeded to the state court, we don't know. He did not file a federal court action timely on that issue. So anyway, that's your concept of the case. Thank you, Your Honor. Any questions? Thank you. Your Honor, what the state is describing here is simply not Goldsmith's experience. It's not what he's alleging is going on. He's not alleging that he can write non-offensive material. He's not saying he can write non-offensive material. He is not contesting, I take it, the general standard that the correction system has propounded about rehabilitation and discipline. He is contesting the way it's being applied to him, correct? Correct, although he did file a motion for a declaratory judgment at one point, but he was addressing how it's been applied to him. Right. But he's alleging that he can't write anything. Well, the standard doesn't say that he can't write anything. I mean, certainly that standard, if it did say that, would be totally unconstitutional. Correct. Okay. So he's not claiming that that's what the standard says. He's claiming that as the standard is applied, it's being applied in a way that is, if not total censorship, very, very broad censorship of material that is protected by the First Amendment. Is that right? Yes, Your Honor, although I would add that he's alleging something beyond just the application of the standard here. He's alleging in the form of these threats that he's been comprehensively banned from writing whatsoever. So it's not limited to just application of the standard. It's personalized to him. He cannot write. He's saying that the standard is being applied in a way that is a comprehensive ban on anything he's writing. Is that what he's saying? Yes, Your Honor. That's a fair way to put it, I think. But, again, we're at the motion to dismiss stage. So when we take the facts in the light most favorable to him, his allegations here of a comprehensive ban are plausibly supported by the facts, by what he includes here. And what Your Honor's questions earlier regarding the application of the First Amendment in this context, what those questions make clear, again, is that the First Amendment claim can't be decided here. It can't be decided on this record. The court only has the timeliness issues before it. We agree with you on the statute. We should just remand the case to the district court and let the record be, let it go forward from that point, right? Exactly, Your Honor. That's exactly what we're asking for. Do you allege that Sharrett or Corbett told him that he can't write anything? Your Honor, we're not alleging. There's nothing in the record that says that they specifically said that to him, but it was in their actions. And, again, he alleges that Deputy Aalto at Marquette Branch told him, the writing restriction in your file will be enforced by my guards. And then he received the periodic threats. What threats? You referred to periodic threats. Threats of what? Defendant Sharrett and other guards made periodic verbal threats and conducted frequent cell searches that he claims were intended to deter him from writing anymore at the new prison. Did he file a grievance on that? Your Honor, I don't recall that he included a grievance. See, that's the whole ballgame. Well, he filed a grievance in 2011 at the new prison. He's filed grievances. There's over a dozen grievances in the record and potentially more. What did they say? He's challenged every— What did they say? What was the finding on the grievance? On which grievance, Your Honor? The last one, the 2011, when he said, I'm not allowed to write. Your Honor, the record indicates that—his complaint indicates that that grievance was ignored and then he filed a subsequent formal grievance, and I don't think— So there was an informal grievance, but the formal grievance procedure is the one he has to follow. Correct, Your Honor. And what was the result of that? I don't think that that's in the record. Well, did somebody make an—I mean, was it the claim that I'm being barred from writing everything? Is that what he complained about? Yes, Your Honor. He alleged specifically an ongoing— So wasn't there a finding of fact that he either was or wasn't? Your Honor, again, I don't think that that's in the record here. The record is very sparse. But that's another reason for this court to allow the district court to develop the record, and we can get answers to those questions. Okay. Any other questions? He didn't have a counsel below in the district court? No, Your Honor. He was pro se. So he wouldn't know exactly how to go about it. Sorry? He wouldn't know exactly how to go about trial of a question. It doesn't appear from the record that he would know exactly how to go about it. Yes, Your Honor. Thanks. I would suggest this probably wasn't Mr. Goldsmith's first rodeo, was it? Your Honor, actually, we've looked into— He's been here before, you said. There's no indication that he's been before this court before. I thought you said the prior panel. Prior panel—yes, Your Honor, that was this case. Well, I mean, he's been here before this time. Yes, Your Honor, but alleging this exact same set of facts. Thank you.